**151 P.2d 57**
**STATE v. SHEDOUDY.**
**No. 4777.**

Supreme Court of New Mexico.

Aug. 18, 1944.

Fred C. Stringfellow, of Raton, for appellant.

Edward P. Chase, Atty. Gen., and Robert W. Ward, Asst. Atty. Gen., for appellee.

THREET, Justice.

Appellant was convicted and sentenced to the State Penitentiary upon a charge by information that he, on the 18th day of August, 1938, at the County of Colfax, New Mexico, "did unlawfully and feloneously, having obtained possession of certain personal property of the General Motors Acceptance Corporation by virtue of a conditional sales contract, take, and carry away and conceal said personal property, to-wit: one 1938 Master Deluxe Chevrolet Sedan, motor number 1408085, serial number 6HA11-7884, the value of more than $100.00 while title to said personal property was in the General Motors Acceptance Corporation, and without the consent of the title owner of said property."

The statutes under which appellant was informed against are as follows:

"Any person who, having obtained possession of any personal property from the owner or possessor thereof, under a conditional sales contract, and who prior to the vesting of the title in him pursuant to such conditional sales contract, shall sell, transfer, encumber, conceal, take, drive or carry away, or in any manner dispose of such property contrary to the provisions of such conditional sales contract, and without the written consent of the owner under such conditional sales contract, shall, if said property be of the value of one hundred dollars ($100) or more, be deemed guilty of a felony, and on conviction shall be fined in a sum not exceeding five thousand dollars ($5,000), or be punished by imprisonment in the penitentiary for a period of not less than one (1) year nor more than three (3) years, or both such fine and imprisonment in the discretion of the court." 1941 Comp. Sec. 41-2143.

"The term 'conditional sales contract' as used in this act * * * shall be construed to mean and include all contracts, leases, purchase leases, sale leases, or other instruments of writing which are intended to hold the title to personal property in the former owner, possessor or grantor." 1941 Comp. Sec. 41-2142.

The appellant, who bought the automobile from the E. H. Robinson Chevrolet Company at National County, California, on a conditional sales contract in the name of his daughter Alexendra Shedoudy, drove it from San Diego, California, to Raton, New Mexico, and left it in a garage for repairs, where the holder of the legal title, the General Motors Acceptance Corporation, took steps to repossess and

stored it, allegedly because of the delinquency of appellant in making the payments due under the contract.

After the General Motors Acceptance Corporation had repossessed the car, appellant either broke into the garage, or, as he claims, he found the door open, and drove the car away without the consent of either the General Motors Acceptance Corporation or of the garage. The automobile was found by the sheriff some twenty-five miles from the town of Raton, concealed by brush and boards at the side of an unoccupied house. Appellant offered no evidence, but at the close of the state's case moved the court to instruct the jury to return a verdict of not guilty upon numerous grounds. Those pertinent to the discussion here are as follows:

"That it affirmatively appears from the evidence that said car at the time of taking and concealing had been wrongfully taken by the defendant and was not taken pursuant to the terms of the conditional sales contract.

"That it affirmatively appears that at the time the defendant took the car from the garage in Raton that he was not entitled to possession thereof, and therefore could not be guilty of the crime charged.

"That it affirmatively appears that prior to the concealing of the car, the General Motors Acceptance Corporation had retaken possession of said car under the said conditional sales contract, and that at the time of the concealing the defendant did not have possession of said automobile by virtue of the said conditional sales contract."

The trial court overruled appellant's motion for an instructed verdict of not guilty. He appeals to this court assigning numerous errors. For the disposal of this case, it will only be necessary to notice point two under appellant's first assignment of error which questions the action of the trial court in overruling that part of appellant's motion for an instructed verdict of not guilty, as hereinabove quoted.

This is a challenge to the sufficiency of the evidence to sustain the verdict of the jury.

It becomes important to determine whether the title holder of the automobile had possession, under the terms of the conditional sales contract, at the time the crime is alleged to have been committed. It is manifest that if the title holder of the automobile had repossessed it, appellant would not be guilty of the crime charged. His right to the possession and dominion over the automobile having terminated, his subsequent taking and concealing of the automobile would not be by virtue of any right under the conditional sales contract.

In State v. Shedoudy, 45 N.M. 516, 118 P.2d 280, 284, an appeal from the first conviction in this case, we said:

"If appellant was not entitled to possession of the car at the time he took it from the garage, then he was not guilty of the crime charged, the very foundation

of which was the alleged fact that he held possession by virtue of a conditional sales contract at the time he committed the acts charged in the information, if he did commit them."

That portion of the conditional sales contract giving the right to the title holder to repossess the automobile is as follows:

"Time is of the essence of this contract, and if purchaser default in complying with the terms hereof, or seller deems the property in danger of misuse or confiscation, seller may take immediate possession of said property without demand (possession after default being unlawful), including any equipment or accessories thereto; and for this purpose seller may enter upon the premises where said property may be and remove same. Such repossession shall not affect seller's right, hereby confirmed, to retain all payments made prior thereto by the purchaser hereunder. Seller may resell said property, so retaken, at public or private sale, without demand for performance, with or without notice to purchaser (if given, notice by mail to address below being sufficient), with or without having such property at place of sale, and upon such terms and in such manner as seller may determine; seller may bid at any public sale. From the proceeds of any such sale, seller shall deduct all expenses for retaking, repairing and selling such property, including a reasonable attorney's fee. The balance thereof shall be applied to amount due; any surplus shall be paid over to purchaser; in case of deficiency purchaser shall pay same with interest. Seller may take possession of any other property in above described motor vehicle at time of repossession, whenever such other property may be therein, and hold same temporarily for purchaser without liability on the part of seller."

The evidence of the State, bearing upon this question, is in substance as follows: F. L. Schooley testified that he was working for the General Motors Acceptance Corporation during the years from 1937 to 1939 as a district representative; that in the month of August, 1938, he received a telephone call from the General Motors Acceptance Corporation to pick up or hold a car used by appellant; after he received the telephone call he came to Raton, New Mexico; the car was not there and on the following day he came back and found the car at the United Chevrolet Garage; that he filled out a storage report as to the condition of the car, checked the mileage, serial and motor number, and instructed the garage foreman of the United Chevrolet Garage that the car was held for the General Motors Acceptance Corporation; Mr. Shedoudy came in the garage while he was completing the report and he talked with him at that time; he returned to Trinidad that evening after leaving instructions that the car was to be held for the General Motors Acceptance Corporation.

That he took possession of the car August 23, 1938, at Raton, New Mexico, because of delinquency of payments as he had been informed; the car was in the pos-

session of the United Chevrolet Garage at the time, and he instructed them not to release the car without his instructions; he put a hold order upon the car and would not let appellant have it; he did not give appellant permission to take the car; he was holding it on instructions; he did not know why the instructions were given, but he told them (the garage) to hold the car; in the conversation with appellant in the garage he told appellant not to take the car, appellant said that he (the witness) had no right to issue those instructions; he did not turn the car over to appellant; that appellant wanted possession of the car after it was repaired, but he told appellant he could not have possession at all; he gave orders, or instructions, to the United Chevrolet Garage to hold the car and the garage did not give appellant possession of the car; he told the shop foreman not to release the car without his permission, but to hold it for him; he was claiming the right to the possession, and made it stick until appellant took the car without his knowledge or consent; the garage was holding the car under his orders and under the orders of appellant and Insurance Company; he did not tell them (the garage) that he had repossessed the car, but that was the way he repossessed cars, just goes to a garage or where he might find them and if it is in a garage he tells them to hold it; that he advised the Chevrolet Garage, as his agent, to hold the car; that he was later informed that the car had been taken from the garage, and he returned to Raton that same even-ing where he met appellant and the following conversation took place:

"A. That conversation lasted about an hour. At the beginning of the conversation I asked Mr. Shedoudy what he meant by breaking into the garage and taking the car out, and he said he did not break into the garage and the door was open and he simply went in and drove the car out. At the time we were talking there was a crowbar under the chair I was sitting on and I asked him if that was the crowbar he used to break in the door, and he said he had not done any such thing, that the door was wide open and there was a mechanic in the garage at that time. I asked him where the car was and he gave me no information other than the car was on its way to Denver or California.

"Q. He did say he took the car out of the garage? A. Yes, sir, he said the garage was open and the car was there and there was no reason why he should not take the car out. I told him that I had left instructions to hold the car and I had told him that that afternoon, and he said his attorney told him my instructions meant nothing. We talked considerable about the whereabouts of the car, but I could get no information whatever other than what I previously stated. I said I was convinced the car was not on its way to California or Denver, and he said if I was smart along that line I could find it, and I looked around for it but could not find it. Then we discussed the condition of the contract and the balance on it and Mr. Shedoudy

said he was not in default on the contract, and at that time the only information I had regarding the matter was as obtained by their telephone call, and I had been instructed to hold the car for the balance plus one hundred and five dollars legal fees plus a radion contract of some fifty-eight dollars. Not being familiar with the circumstances, I asked Mr. Shedoudy what that was for, and he said he did not owe those amounts but he would pay the balance of the contract the following day. I told him I had no authorization to accept any such settlement but I would get in touch with the office and find out if that settlement was satisfactory and would see him the next day."

C. E. Magourik testified that he was the service manager for the United Chevrolet Garage; that he knew F. L. Schooley and saw him and appellant around the garage the day the car disappeared; that he had received instructions from the General Motors Acceptance Corporation to hold the car.

There was evidence tending to show that the garage, where the automobile was in storage, had been broken into. The lock on the door was broken, the inside latch pried off, and pieces of the door were found on the floor. There was also evidence that appellant was in default in his payments under the terms of the contract, which would give the title holder of the car the right of repossession.

The general rule as to the right of the conditional vendor to take possession of property sold under a conditional sales contract upon the default of the vendee may be found in 47 Am.Jur. 153, Sec. 942, where it is said:

"It is uniformly agreed that the vendor has the right to take or recover possession of the property sold under a conditional sales contract upon the default of the vendee. This right comes into existence at the time the conditional sales contract is entered into, not necessarily by reason of any provision of the conditional sales contract, but by reason of the retention of title in this form of transaction. This is the rule even though there is no stipulation in the contract declaring the whole debt due in case of default. A consent by the conditional vendee to the retaking by the vendor upon default is implied in the every form of the contract itself. * * *"

Leedy v. General Motors Acceptance Corporation et al., 173 Okl. 445, 48 P.2d 1074; Burgin et al. v. Universal Credit Co. et al., 2 Wash.2d 364, 98 P.2d 291, 298; Goldberg v. List et al., 11 Cal.2d 389, 79 P.2d 1087, 1090, 116 A.L.R. 900.

In Goldberg v. List, supra, the court said: " * * * at the time the conditional vendee entered into the conditional sales contract, the right of the conditional vendor upon default to require the return of the property came into existence, not necessarily by virtue of any provision of the conditional sales contract but by virtue of the retention of title under this particular form of transaction. Jones on Chattel Mortgages and Conditional Sales, Vol. 3, Sec.

1283. In other words, a consent by the conditional vendee to the retaking of possession by the vendor upon default was implied in the very form of the contract itself. The vendors exercised this right by making demand upon the respondents for the return of the property and the respondents having no other course open to them but to comply with said legally enforcible demand, may be reasonably said to have acted pursuant to the consent given by the vendee to the vendor upon the entering into of the conditional sales contract."

That the conditional sales contract gave the title holder of the automobile the right to repossession upon default of appellant, there can be no question. The fact that the title holder did exercise its right, and did in fact repossess it, must be determined from the facts and circumstances attending the transaction. All the evidence in the case leads to but one conclusion, that the title holder of the automobile had repossessed it at the time the appellant took it from the garage.

Moreover, on a prior appeal of this case, State v. Shedoudy, supra, under the same facts and circumstances as in the instant case, we held that the title holder had repossessed the automobile and stored it, using the following language: "The appellant, who held the car by virtue of a conditional sales contract made in the name of his daughter, drove it from San Diego, California to Raton, New Mexico. At Raton he left it at a garage for repairs, where the holder of the legal title repossessed and stored it, allegedly because of his delinquency in making a payment due thereon." The effect of the holding in our prior decision was to render it impossible for appellee, under the same facts and circumstances, to prove one of the essential elements of the corpus delicti, viz.: that appellant while in the possession of the automobile under the sales contract, without permission of the title holder, disposed of, or concealed it contrary to the terms of the contract.

The witness, Schooley, agent for the title holder, in the presence of appellant instructed the foreman of the garage to hold the automobile under his orders. Appellant was instructed by the witness, Schooley, not to take the automobile from the garage. The only protest, if it may be so construed, appellant made, was that Schooley had no right to issue the instructions to hold the automobile. This was not such a protest as would indicate that appellant had repudiated the terms of the sales contract, wherein he had consented to the right of the title holder to repossess the automobile upon his default. His silence and inactivity in this regard strongly indicate that he acceded to the right of the title holder to repossess the automobile pursuant to the consent given upon entering into the sales contract.

In the case of Studebaker Bros. Co. v. Witcher et al., 44 Nev. 442, 195 P. 334, 337, one J. D. Flamm on April 6, 1917, purchased an automobile from the respondent, Studebaker Bros. Company, under a conditional sales contract, which retained title

in respondent until purchase price was made. On June 30, 1917, the automobile was sold by the sheriff under an execution to satisfy a judgment against Flamm. Witcher, appellant, was the purchaser at the sheriff's sale. The sheriff delivered possession of the automobile to Witcher with a certificate of sale reciting that under the sale "all the right, title and interest of the defendant, J. D. Flamm, in and to the automobile in question was transferred to the purchaser on execution." Subsequently Witcher placed the automobile in the Service First Garage belonging to the Lincoln Highway Garage Company and told the attendant that the automobile belonged to August Smith. Thereafter the attendant took instructions from Smith and washed the automobile at his request. On July 16, 1917, a Mr. Quayle, attorney for respondent, and Mr. Mathias, an owner in the Lincoln Highway Garage Company visited the Service First Garage and moved the automobile to a place in the garage where it did not interfere with the moving of other automobiles, and by means of a lock and chain locked one of the wheels to the frame. Quayle instructed the attendant that he had taken possession of the automobile for the Studebaker Company and that if anything occurred in regard to it, to tell any of the parties that the key was at his office.

On July 21, 1917, appellant and one Jurich moved the automobile from the garage. It was later found on the street by Quayle. Respondent sued for conversion of the automobile. From a judgment appellants appeal. In sustaining the trial court, the Supreme Court said:

"Respondent's right to retake possession of the automobile upon default of the obligations imposed upon Flamm in the contract of sale was absolute, and the exercise thereof through its agent Quayle, on the 21st day of July, 1917, made respondent's possession lawful. When, therefore, appellant subsequently came to the garage, and under circumstances tending to show force resumed possession of the property, his taking it from the lawful possession of the owner was tortious and amounted to a conversion. Counsel for appellant contends that the taking of the automobile by the appellant was not wrongful or unlawful, for the reason that neither he nor the sheriff, who conducted the sale, had any notice of respondent's claim to the property. It is difficult to see how the absence of such notice could affect the right of possession. Appellant had no better title than Flamm. Through his purchase and the certificate of sale he succeeded to all of Flamm's right, title, and interest in the property. Flamm had no interest in the property beyond a right to purchase it on condition, which was subject to forfeiture for nonpayment and by the violation of other obligations imposed on him in his contract with respondent. When the respondent, by reason of Flamm's failure to keep his contractual obligations, exercised its right to retake possession of the property under the terms of the contract, Flamm's interest and ap-

pellant's title met with a common fate and were extinguished."

■ The burden being on appellee to establish, by substantial evidence, that appellant, while in possession of the automobile under the sales contract, disposed of or concealed it without the permission of the title holder, and having failed to discharge this burden, the verdict cannot stand. All the evidence in the case is consistent with the contention of appellant that he gained possession of the automobile after it had been repossessed by the title holder. He argues that, while he might be guilty of some crime, he was not guilty of the crime charged. In this, we think appellant is correct.

The automobile having been repossessed by the title holder, the taking of it by appellant, without the consent and knowledge of the title holder, from the garage, would constitute a crime, but not the one here charged. State v. Hubbard, 126 Kan. 129, 266 P. 939, 58 A.L.R. 327.

Other questions have been raised by appellant but, due to what has been said, it will be unnecessary to pass upon them.

For the reasons herein stated, the judgment will be reversed and the cause remanded with instructions to set aside the judgment and dismiss the cause.

It is so ordered.

MABRY and BRICE, JJ., concur.

BICKLEY, Justice, and SADLER, Chief Justice (dissenting).

The trial court submitted this case to the jury in the belief that repossession by title holder of the car in question was issuable. Touching this question the prevailing opinion states:

"All the evidence in the case leads to but one conclusion that the titleholder of the automobile had repossessed it at the time the appellant (defendant) took it from the garage."

We challenge vigorously the accuracy of that statement. Quite the contrary, the evidence on the issue of repossession was such that, when resolved either way by the jury, the verdict would not lack substantial support. This we shall demonstrate.

A brief statement of the State's method of proof will assist in a true appraisal of the evidence at the close of the State's case. The defendant did not take the stand nor put on any evidence. The State introduced as a witness one F. L. Schooley, the representative of General Motors Acceptance Corporation, hereinafter referred to as the finance company, claimed in the prevailing opinion to have repossessed the car; also a transcript of certain testimony at the former trial given by one C. E. Magourik, service manager of United Chevrolet Garage in Raton, where the car was stored for repairs at the time of the acts now claimed by defendant to have amounted to repossession as a matter of

law and by the State to leave the matter issuable.

It is an admitted fact that the car was in the lawful physical possession of the defendant under the contract when he brought it into the garage for repairs only two days before the acts in question following an accident. While certain repairs were under way in the main garage and before removal to the body shop, a separate building 24 feet distant therefrom, where it was necessary to take it to make body repairs ordered by defendant, the finance company representative, Schooley, visited the garage, identified the car as the one covered by the defendant's contract by checking its motor and serial number, and instructed Magourik, service manager, to hold the car and to let no one have it without his permission. The defendant was in the garage at the time seeing after the repairs. The finance company representative also informed him that he had instructions to tie up the car because of default in making of payments under the contract. The defendant, Shedoudy, did not acquiesce in the finance company's claim of right to possession. On the contrary, he challenged the right of its representative to instruct the service manager to hold the car. Schooley testified:

"Q. Did he (defendant) resist your possession at that time? A. Yes, sir, he said I had no right whatever to issue those instructions."

The service manager, Magourik, neither by word, act nor conduct, indicated acquiescence in or acceptance of the instructions from Schooley to hold the car. And the defendant himself, by interposing an objection which was sustained, blocked the State's efforts to elicit knowledge on Schooley's part as to whether the United Chevrolet Garage would or would not have abided by his instructions. On redirect examination by the State, the following occurred, to-wit:

"Q. Do you know whether or not the United Chevrolet Garage would or would not have abided by that order?

"Mr. Stringfellow: We object as that calls for a conclusion.

"The Court: Sustained."

Although the witness was not permitted to answer the foregoing question, it may fairly be assumed that in relating what transpired between him, the service manager and Shedoudy, he told the whole story and that he would have had to answer "No," thus proving that defendant's objection to an answer was well taken.

The foregoing being all that was said on the occasion in question, as testified by Schooley, the finance company representative, and by the service manager, Magourik, it now remains to be seen whether there was anything to go to the jury on the fact of repossession or whether the trial court should have held as a matter of law on the motion for directed verdict that repossession had been accomplished.

It is an undisputed fact that the car came into the garage in the physical pos-

session of the defendant. It is an undisputed fact that it left the garage in his physical possession two days later. When it passed out of his physical possession upon leaving the car at the garage for repairs, it passed into the physical possession of the United Chevrolet Garage as bailee for requested repairs, remaining in defendant's constructive possession. This was the status on the question of possession when the parley between the finance company representative, the service manager and the defendant took place, a few hours prior to the time when defendant again took the car into his physical possession.

The prevailing opinion overlooks some very important testimony by the finance company representative, Schooley, bearing on the issue of repossession. On redirect examination he testified:

"Q. Did the United Chevrolet Company give the possession of that car to you? A. No, sir.

\' * * * * * *

"Q. In August, 1938, did the United Chevrolet Company actually give the possession of the Shedoudy car to you? * * * A. I never had physical possession of the car."

Thus, if we are to overrule the jury's verdict, it is because of what would seem to us a sort of legal legerdemain whereby at some instant of time subsequent to the meeting of the three persons mentioned and after the colloquy which there transpired, possession of the car passed constructively from the defendant to the finance company. Its physical possession never changed from the time defendant left it in the garage for repairs until he took it from the garage following the colloquy, being in United Chevrolet Garage all the while.

Let us see if this may be deemed accomplished by facts so one sided that reasonable minds could not differ regarding them but must inevitably reach the same conclusion. Remember this important fact: Physical possession of the car never changed from the time it left defendant's physical possession until it came back into his physical possession. In the interim it was in the physical possession of United Chevrolet Garage and, admittedly, in its possession as defendant's bailee until the time of the colloquy between the finance company's representative, the service manager and the defendant. Then, at what instant of time, if ever, did United Chevrolet Garage cease to be defendant's bailee and become bailee of the finance company? The answer to that question must depend on the state of mind of the service manager. The finance company representative stated in his and defendant's presence that he was taking the car into his possession, admonishing the service manager to let no one have it except upon his order. The service manager said neither yea nor nay to this admonition.

The witness Schooley admitted he did not take the car into his physical possession. He neither moved it, nor secured

it against moving, as with chains, nor locked the wheels, as was the case in Studebaker Bros. Co. v. Witcher, 44 Nev. 442, 195 P. 334, a decision relied upon in the prevailing opinion. He did not even take the key of the car. So far as repossession was concerned, if repossessed, it was done merely by an assertion in defendant's presence, to which the latter did not assent but, on the contrary, vigorously protested and as to which the service manager remained absolutely silent.

Subsequently, the car was moved into the body shop, another building, and the body shop was locked. This removal took place near closing time the same evening and was seemingly in order to begin the next day the body work ordered by defendant. Let us see whether the act of moving the car into the body shop was in obedience to Schooley's hold order, or in pursuance of the garage company's first duty as bailee to the defendant to repair the car and redeliver same to him. The testimony of the service manager furnishes an answer. He testified:

"Q. For what purpose was the car put into the body shop? A. To get the car straightened; the left side of the body was damaged in the accident."

In other words, the bailee, United Chevrolet Garage, was continuing to perform instructions given it by the defendant. It was he who ordered repairs. Neither the finance company nor anyone else had ordered any.

The equivocal nature of the testimony relied upon by defendant as showing repossession, thus rendering the fact of repossession issuable, is reflected by defendant's cross examination of Schooley, the finance company representative, as follows:

"Q. You said awhile ago that you issued a hold order on this car? A. I told the shop foreman not to release the car without our permission.

"Q. To hold it for you? A. Yes, sir.

"Q. It was a repossession, was it not? A. No, sir.

"Q. Were you not claiming the right and possession of that car at that time? A. I was claiming it.

"Q. And you made that stick until Mr. Shedoudy came and got the car without your knowledge or consent? A. Yes, sir, it was in the possession of the United Chevrolet Company.

"Q. And they were holding it under your orders? A. Yes, sir, and also under the orders of the Insurance Company and Mr. Shedoudy.

"Q. You told them to hold it as you had repossessed it? A. I did not tell them I had repossessed it.

"Q. But that is the way you repossess a car? A. Yes, sir.

"Q. And that is what you did? A. There is a difference in a legal form of repossession."

The evidence supports defendant's contention that he was not in default in his payments on the car, but that, as disclosed by a discussion between him and the finance company representative subsequent to the claimed repossession, he challenged a radio charge of $58 and an item for attorney's fees of $105, embraced in the list of alleged defaults on his part. The finance company's own ledger sheet disclosed, and its credit manager as a witness testified, that not a single installment payment had ever been made on time, defaults ranging from one to thirty-two days in payment thereof, and the one overdue when repossession was attempted was in default only seven days at such time. Without notice to purchaser that punctuality in payment would be insisted upon thereafter, and admittedly no such notice was given, this default would not support the right to repossess. Giannini v. Wilson, 43 N.M. 460, 95 P.2d 209.

The record fails to disclose that the finance company man exhibited any title papers, conditional sales contract or anything else to the garage company in proof of his asserted right to repossession. The garage company was first bailee for the defendant. It was changing allegiance on slight provocation if, solely on what transpired in the colloquy between the defendant, the service manager and the finance company representative, it became bailee of the latter. The service manager said *nothing* to indicate that change of allegiance and what he *did* after the colloquy and before defendant physically repossessed the car actually was more consistent with *continuing* as bailee for the defendant than with *becoming* a bailee for the finance company.

Furthermore, viewing charitably the defendant's physical repossession of the car, it reflects the sincerity of his statement to the finance company representative as testified by the latter that he, Schooley, had no right to give the instructions he did to the service manager. If the defendant was sincere in that belief, righteous indignation on his part would easily exonerate him in his own mind of larceny in taking what he already possessed through his bailee. We have direct authority in the books for taking defendant at his word. State v. Greenlee, 33 N.M. 449, 269 P. 331; State v. Luttrell, 28 N.M. 393, 212 P. 739. In the first mentioned case the court said [33 N.M. 449, 269 P. 333]:

"So, here, we have a question of appellant's mental state, his belief. He alone could say with certainty what he believed. He says he believed deceased was about to take his life, but does not intimate that he believed deceased had committed, or was about to commit, adultery with his wife. An accused person need make no special defense. He need not testify. If he does not, he may demand the submission of every theory of mitigation or justification which the evidence discloses. But, if he does testify, it is fair and reasonable that he be taken at his word."

The prevailing opinion quotes from our opinion on the former appeal of this case,

State v. Shedoudy, 45 N.M. 516, 118 P.2d 280, 283, as follows:

"At Raton he left it (the car) at a garage for repairs, *where the holder of the legal title repossessed and stored it,* allegedly because óf his delinquency in making a payment due thereon." (Italicizing is for emphasis in the prevailing opinion and does not appear in the former opinion.)

It is asserted in the prevailing opinion that the statement just quoted rendered it impossible for the State, under the same facts and circumstances, to prove one of the essential elements of the corpus delicti, namely, that defendant was in possession of the car when the alleged concealment took place. Our former opinion also states:

"If appellant was not entitled to possession of the car at the time he took it from the garage, then he was not guilty of the crime charged, the very foundation of which was the alleged fact that he held possession by virtue of a conditional sales contract at the time he committed the acts charged in the information, *if he did commit them.*" (Emphasis ours.)

It thus appears that we spoke loosely in our former opinion in this case on the question of whether repossession had been accomplished under the proof adduced at the former trial. The more important thing is what we did and we actually reversed and remanded the cause for a new trial. If the court then had entertained the view now expressed in the prevailing opinion on the question of repossession, it would have directed the defendant's discharge instead of awarding a new trial.

The defendant did not take the stand and thus did not choose to avoid the heavy burden assumed by one demurring to the evidence. In Paulos v. Janetakos, 41 N.M. 534, 72 P.2d 1, 6, we said: "He (demurrant) still may meet the case on the merits," if his demurrer be overruled. The defendant's motion for a directed verdict was in effect a demurrer to the evidence. It was overruled and the defendant took the risk of standing on the ruling. In our opinion, the court properly overruled the motion for a directed verdict.

We express no opinion whether other claimed errors in the record justify a reversal since the prevailing opinion rests itself squarely on the one discussed. We stop with our appraisal of it. It follows from what we have said that we think the trial court correctly submitted to the jury the issue of repossession of the car. Because of a contrary conclusion by the majority, we dissent.